**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**KIMBERLY COLTON,**

                         **Plaintiff,**

     **-against-**                                    **5:14-CV-00801**

**STATE OF NEW YORK DIVISION**
**OF STATE POLICE,**

                         **Defendant.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**

## DECISION & ORDER

## I.    INTRODUCTION

Plaintiff Kimberly Colton, a State Trooper employed by the New York State Police ("State Police"), alleges employment discrimination in violation of Title VII, 42 U.S.C. § 2000e, *et seq.* ("Title VII").   Defendant moves for summary judgment dismissing plaintiff's claims.  Dkt. # 73.  Plaintiff opposes the motion, Dkt. # 80, and defendant filed a Reply. Dkt. # 84.  The Court decides the motion on the basis of the parties' submissions without oral argument.  For the reasons that follow, the motion is granted.

## II.    STANDARD OF REVIEW

On a motion for summary judgment the Court must construe the properly disputed facts in the light most favorable to the non-moving party, see Scott v. Harris, 127 S. Ct. 1769, 1776 (2007), and may grant summary judgment only where "there is no genuine

issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  A party seeking summary judgment bears the burden of informing the Court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

While the Court must view all admissible facts in the light most favorable to the nonmoving party, it need do so "only if there is a 'genuine' dispute as to those facts."  Scott, 127 S. Ct. at 1776.  The nonmoving party cannot defeat summary judgment by "simply show[ing] that there is some metaphysical doubt as to the material facts," Matsushita., 475 U.S. at 586, or by a factual argument based on "conjecture or surmise." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  In this regard, a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in the pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

The Local Rules of the Northern District provide a procedure for the efficient

resolution of summary judgment motions.  See N.D.N.Y.L.R. 7.1(a)(3).  This places the

onus on the parties to present the evidence that either supports or defeats the motion.   A

movant must set forth the undisputed facts that, it contends, entitles it to summary judgment

in a Statement of Material Facts.  See N.D.N.Y.L.R. 7.1(a)(3).  "Each fact listed shall set

forth a specific citation to the record where the fact is established."  Id.

Once a properly supported Local Rule 7.1(a)(3) Statement of Material Facts is

submitted, the non-moving party must "file a response to the [movant's] Statement of

Material Facts."  Id.  This requires a statement that "mirror[s] the movant's Statement of

Material Facts by admitting and/or denying each of the movant's assertions in matching

numbered paragraphs."  Id.  "Each denial shall set forth a specific citation to the record

where the factual issue arises."  Id.

The responding Statement of Material Facts is not a mere formality, and the courts

apply this rule strictly.  The failure to properly controvert a supported statement of fact by

pointing to admissible evidence contravening the movant's evidence results in the movant's

statement being deemed admitted.  See N.Y. Teamsters Conference Pension & Ret. Fund

v. Express Servs., Inc., 426 F.3d 640, 648-49 (2d Cir. 2005);[1] Gubitosi v. Kapica, 154 F.3d

30, 31 n. 1 (2d Cir. 1998)(per curiam);[2] Meaney v. CHS Acquisition Corp., 103 F. Supp.2d

---

[1](upholding grant of summary judgment where "[t]he district court, applying Rule 7.1(a)(3) strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1(a)(3) statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations.")

[2](accepting as true material facts contained in unopposed local rule statement of material facts)

104, 108 (N.D.N.Y. 2000);[3] McKnight v. Dormitory Auth. of State of N.Y., 189 F.R.D. 225, 227 (N.D.N.Y. 1999).[4]  Conclusory denials unsupported by specific citations to the record are insufficient.  See N.Y. Teamsters Conference Pension & Ret. Fund, 426 F.3d at 648-49.  Moreover, the Court is not required to search the record for evidence that the parties fail to point out in their Local Rule statements.  See Amnesty America v. Town of West Hartford, 288 F.3d 467, 470 (2d Cir. 2002);[5] Monahan v. New York City Dep't of Corrections, 214 F.3d 275, 291 (2d Cir. 2000);[6] Osier v. Broome County, 47  F. Supp.2d 311, 317 (N.D.N.Y. 1999).[7]

III.    **BACKGROUND**[8]

   **a. Procedural**

   Pursuant to the Court's previous decisions in this case, the following claims remain: (1) gender-based hostile work environment; (2) retaliatory hostile work environment; and (3) retaliatory discrete acts occurring on or after November 2, 2012. See Dkt. # 40, Dkt. # 54.

---

[3](deeming movant's Rule 7.1(a)(3) Statement admitted where non-movant's response "set forth *no* citations – specific or otherwise – to the record")(emphasis in original)

[4]("deem[ing] the portions of Defendants' 7.1(a)(3) statement that are not specifically controverted by Plaintiff to be admitted")

[5]("We agree with those circuits that have held that Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.")(citations omitted)

[6](The Local Rules require the parties "to clarify the elements of the substantive law which remain at issue because they turn on contested facts" and the Court "is not required to consider what the parties fail to point out.")(internal quotation marks and citations omitted)

[7](deeming admitted all facts in defendants' Rule 7.1(a)(3) statement where "plaintiff submitted thirteen pages of purported facts without any indication where those facts can be located in the record")

[8]Unless indicated otherwise, the following facts are taken from defendant's Statement of Material Facts [dkt. # 73-2] containing facts that are either admitted by plaintiff or which are supported but not properly controverted. See Resp. 7.1(a)(3) Stat. [dkt. # 80-5].

The individual defendants were previously dismissed from the action. See Dkt. # 54. Because plaintiff's EEOC complaint only addressed matters involving supervisors Captain Neil Gallivan, Sergeant James O'Brien, and Sergeant Nancy Mazur, any claim concerning conduct by any other of defendant's employees is barred. See Dkt. No. 54, p. 10.

### b. Factual

Plaintiff began her employment with the State Police in October 2000.   She was assigned to SP Auburn for approximately 12 years, beginning in 2002 and ending in March 2014.   Within those 12 years, plaintiff was transferred to SP Waterloo for approximately a year in 2011, but then returned to SP Auburn.  Plaintiff transferred to New York Thruway, Troop T, in Syracuse, New York, in March 2014, and is currently stationed there.  Most, if not all, of plaintiff's allegations concern the time she was stationed at SP Auburn.

James O'Brien is a Zone Sergeant at SP Auburn and, at relevant times, supervised approximately 60-80 troopers and 10-11 station sergeants.  He supervised plaintiff at SP Auburn from early 2005 to 2014, but he was not her immediate supervisor.[9]   Zone Sergeant O'Brien also briefly supervised plaintiff in 2002 at SP Syracuse.   At that time, he was her station commander and thus her immediate supervisor.  In 2013, Zone Sergeant O'Brien supervised approximately four or five female troopers, in addition to plaintiff.

Neil Gallivan has been a captain at SP Auburn since August 2010.  He supervised plaintiff from August 2010 to March 2014, when she left SP Auburn.  There were approximately four levels of supervision between Captain Gallivan and plaintiff during the time he supervised her: line sergeant, station commander, two zone sergeants, and

---

[9]A station sergeant or station commander ranks between troopers and zone sergeants for purposes of the chain of command.

lieutenant.

Plaintiff's job performance was consistently below that of the average of her fellow troopers at SP Auburn.  Defendant's Statement of Material Facts, Dkt. # 73-2, ("Def. Stat. Fact,"), ¶ 15 (citing Ex. H, pp. 74-83; Ex. C, pp. 893- 1256).[10]  Plaintiff's statistics and that of her fellow troopers were compiled frequently, and revealed plaintiff's below average performance measures.  Def. Stat. Fact, ¶ 16 (citing Ex. C, pp. 893-1256).[11]  Plaintiff's activity was at times the lowest of all troopers at SP Auburn. Def. Stat. Fact, ¶ 17 (citing Def. Ex. H, p. 80; Def. Ex.  C, pp. 893-1256).[12]  Although Plaintiff received 12 "satisfactory" six-

---

[10] Defendant's statement is based upon a quantitative analysis of the functions of the troopers at SP Auburn, such as monthly arrests and tickets issued.  Defendant supports its contention with a citation to Zone Sergeant O'Brien's deposition transcript in which he discusses plaintiff's job performance in relation to other Troopers at SP Auburn based upon his review of the statistical analysis of all SP Auburn Troopers' performances in their employment functions, see Def. Ex. H, pp. 74-83, and with the actual statistical compilations he referred to. Def. Ex. C, pp. 893- 1256.

Plaintiff indicates that she "disputes" the statement, and although she does not provide citation to any admissible evidence, she asserts:

Plaintiff disagrees that her job performance was consistently below average. Plaintiff worked night shifts the majority of time and had above average numbers for DWI and other arrests. Plaintiff received three separate trooper of the year awards for her DWI activity. Only once in 14 years did Plaintiff receive a below standard evaluation and that occurred after Plaintiff filed a hostile work environment complaint.

Pl. Resp. Stat. Mat. Fact, ¶ 15.

The areas in which plaintiff contends she was above average and/or received commendation, or the fact that she received standard evaluations during her employment, does not negate the defendant's supported assertion that her overall job performance was below that of the average trooper at SP Auburn.

Because defendant's statement is supported by admissible evidence and plaintiff's is not, the Court accepts defendant's assertion for purposes of this motion.

[11] Plaintiff asserts that she "disputes this statement," stating merely: "See response to Statement 15," which is referenced in footnote 10, supra.  For the reasons discussed in footnote 10, plaintiff's dispute of defendant's properly supported facts is insufficient for purposes of this motion.

[12] Plaintiff asserts that she "disputes this statement," stating merely "see response to Statement 15," which is referenced in footnote 10, supra.  For the reasons discussed footnote 10, plaintiff's dispute of defendant's properly supported facts is insufficient for purposes of this motion.

month reviews for the period of time spanning from February 1, 2005 to January 31, 2013, *see* Pl. Counter Stat. of Fact, dkt. 80-5, ¶¶ 1-12, Plaintiff admits that she received at least two negative performance evaluations. See Colton Dep., Def. Ex. F, pp. 95-96, 107-08.[13] Moreover, there is no dispute that plaintiff's work statistics reveal that, during her time at SP Auburn, her performance in many areas was consistently below average.  Def. Stat. Fact, ¶ 66 (citing Def. Ex. C, pp. 893-1256).

Plaintiff admits that she is not "a strong ticket writer,"  Colton, Dep., Def. Ex. F, p. 47, and that the number of tickets she wrote over the term of her employment was "low." Id. p. 21.  There is no dispute that throughout her career, plaintiff's Vehicle and Traffic Law enforcement efforts were often noted as the lowest at her station.  Numerous of her performance evaluations also noted that she failed to sufficiently enforce the Vehicle and Traffic Law. Def. Ex. A, pp. 108, 116, 148, 268, 439, 440, 444, 465, 586, 588.

In August 2010, plaintiff's union representative, Gary Nuessle, verbalized a complaint with the State Police Office of Human Resources, alleging that plaintiff had been discriminated against and/or harassed by Zone Sergeant O'Brien and that such treatment was related to her gender.  The complaint was forwarded to Equal Employment Opportunity Senior Investigator June Bradley for investigation.  Bradley conducted interviews with several female State Police employees.  All of them stated that they had never witnessed or experienced Zone Sergeant O'Brien treat anyone, including themselves, differently because of their gender.  The complaint was deemed unsubstantiated and the investigation was closed.

---

[13]These negative performance evaluations are discussed more fully in the text, *infra*.

On April 18, 2011, plaintiff's supervisor, Sergeant Nancy Mazur, issued a "performance observation form" stating that plaintiff's efforts to support departmental goals of ensuring highway safety had declined unacceptably.   On April 25, 2011, plaintiff's father contacted the New York State Inspector General's Office, reporting that plaintiff was in a hostile work environment and was being improperly treated by Zone Sergeant O'Brien. Following an investigation that included interviews with at least eight witnesses, it was determined that "there is no evidence to support that [Zone Sergeant O'Brien] treats [plaintiff] unjustly or differently than he does any other subordinate."   It was further noted that Zone Sergeant O'Brien's "actions are within the scope of his duties as Trooper Colton's second line supervisor.  Trooper Colton's performance of her duties are [*sic*] such that constant supervising is required to ensure that assignments are completed in a satisfactory manner."  The investigation was closed with a finding of "unfounded."  The recommendation stated: "Tpr. Colton's allegations are not specific in some areas.  The specific incidents mentioned all appear to be valid supervisory actions on the part of O'Brien."

In April 2011, in the course of her duties, plaintiff was assigned to investigate a complaint that a civilian's mailbox had been damaged.  Plaintiff's immediate supervisor at the time, Sergeant Nancy Mazur, discovered what she considered were missteps in the course of plaintiff's investigation of the mailbox incident, and reported her findings to Captain Gallivan. See Gallivan Decl., ¶ 31; Def. Ex. I, pp. 104-06.   Captain Gallivan reviewed plaintiff's investigation and found that, among other things, plaintiff filed a document with the Town Court of Ira in which plaintiff made allegations purportedly based upon her direct knowledge although she did not have such direct knowledge, and she failed to serve an appearance ticket on an individual although she filed it with the court.  The

investigation was deemed a personnel complaint against plaintiff which was resolved by plaintiff receiving a letter of censure and being fined one vacation day.

In September 2011, plaintiff received an unsatisfactory performance appraisal.  The appraisal stated that plaintiff "has not met Station expectations and has the lowest activity in most categories at the Auburn station."  It additionally noted a lack of effort, lack of "understanding of what is required of her," poor organizational skills, and inaccuracies and untimeliness in submitted reports.

On November 8, 2011, Captain Gallivan completed a memorandum stating that, in the time since he began supervising plaintiff in November 2010, plaintiff "has not been able to adequately perform administrative or enforcement duties that a trooper with ten years of service should be able to."  He observed that "she is unable to regularly complete adequate [reports] without errors and her accident reports require frequent corrections as do her Domestic Incident Reports ["DIRs"].  These errors and omissions are not the occasional oversight, but rather they are the norm for her nearly every day." Def. Stat. Fact, ¶ 33 (citing Def. Ex. C, p. 871).[14]  Captain Gallivan reported that plaintiff "has been the subject of frequent phone calls to the station from Cayuga County 911 asking what her status was because she was seen on the dispatch screen as being off post for extended periods of time, or stationary for extended periods on post but not in-service."  Def. Stat. Fact, ¶ 34

---

[14]Plaintiff does not dispute that the referenced statements exist as part of Captain Gallivan's memorandum, but contends that she "disagrees that she was unable to adequately perform administrative or enforcement duties as a trooper or that she regularly failed to complete adequate reports without errors or that her accident reports required frequent corrections." Pl. Resp. Stat. Fact, ¶ 33.  However, she fails to point to admissible evidence supporting the basis for her disagreement.   Therefore, defendant's properly supported statement is deemed established for purposes of this motion.

(citing Def. Ex.  C, p. 871).[15]  He observed that plaintiff's performance had not improved despite instruction and reminders from her immediate supervisor. Id.  Captain Gallivan attached to his memorandum a chronological outline of plaintiff's unsatisfactory performance. Def. Stat. Fact, ¶ 35 (citing Def. Ex. C, pp. 872-878).[16]  He later reported that in the first eight months during which he supervised plaintiff (November 2010 – July 2011), she had 91 incidents "involving poor SJS entries, report writing, timely submission, inadequate investigation, and failure to adhere to administrative procedures significant enough to warrant action from station supervision.  At the time Tpr. Colton was a ten year veteran."  Def. Stat. Fact, ¶ 36 (citing Def. Ex. C, p. 879).[17]

In December 2011, plaintiff again received an unsatisfactory performance appraisal. In the appraisal, it was remarked that plaintiff "has the lowest activity in most categories at the Auburn station," commented upon plaintiff's lack of organizational skills, inaccuracies and untimeliness in submitting reports, and again recommended remedial training.  Def.

---

[15] Plaintiff responds to this statement by asserting: "Plaintiff Disputes this Statement to the extent that Plaintiff does not agree that she left her post for 'extended periods of time' during her service." Pl. Resp. Stat. Fact, ¶ 34.  Nevertheless, she fails to point to admissible evidence supporting the basis for her disagreement. Therefore, defendant's properly supported statement is deemed established for purposes of this motion.

[16] Plaintiff responds to this statement by asserting: "Plaintiff does not Dispute this Statement to the extent that [it] sets forth a chronological outline. However, Plaintiff disagrees that the content of this Statement is inaccurate and false  [*sic*]."  Pl. Resp. Stat. Fact, ¶ 35.  However, she fails to point to admissible evidence supporting the basis for her disagreement.  Therefore, defendant's properly supported statement is deemed established for purposes of this motion.

[17] Plaintiff responds to this statement by asserting: "Plaintiff does not Dispute [this] Statement to the extent that [it] says what it says, but Plaintiff disagrees with the characterization that Plaintiff failed to adhere to administrative procedures or completed inadequate investigations."  Pl. Resp. Stat. Fact, ¶ 36.  Again, she fails to point to admissible evidence supporting the basis for her disagreement.  Therefore, defendant's properly supported statement is deemed established for purposes of this motion.

Stat. Fact, ¶ 38 (citing Def. Ex. A, p. 84).[18]

In 2011, plaintiff transferred from SP Auburn to SP Waterloo.  SP Waterloo was within the zone that Zone Sergeant O'Brien supervised.   After approximately one year at SP Waterloo, plaintiff voluntarily transferred back to SP Auburn in a "mutual swap" with another trooper.  As part of the mutual swap, plaintiff requested she be placed in Platoon 2.[19]  However, when plaintiff returned to SP Auburn on November 25, 2011, she was placed in Platoon 1.

On January 24, 2011, plaintiff again requested that she be moved to Platoon 2, claiming she would suffer a hardship if she were not moved from Platoon 1.  On February 2, 2011, plaintiff's sergeant stated in a memorandum:  "[Plaintiff's union representative] Tpr. Nuessle contacted me on behalf of Tpr Colton prior to her transfer. I advised him that based on the distribution of personnel anyone transferring into SP Auburn would be assigned to Platoon 1.  Members at SP Auburn were canvassed and all of them wished to remain in their assigned Platoon."   Captain Gallivan completed a section of that memorandum on February 3, 2011, stating: "Tpr Colton was advised prior to transfer that she would be assigned to Platoon 1 and would not be switched."

When plaintiff was not assigned to Platoon 2, she brought an improper practice charge ("IPC") against Captain Gallivan dated April 21, 2011.  The IPC was resolved via

---

[18] Plaintiff responds to this statement by asserting: "Plaintiff does not dispute [this] Statement to the extent that it says what it says. However, Plaintiff disagrees that she lacked organizational skills, made inaccuracies and untimely submitted reports." Pl. Resp. Stat. Fact, ¶ 38.  Once again, she fails to point to admissible evidence supporting the basis for her disagreement.  Therefore, defendant's properly supported statement is deemed established for purposes of this motion.

[19] The word "platoon" refers to the Troopers' schedules.  When Platoon 1 is working, Platoon 2 is off, and *vice versa*. See Def. Ex. G, pp. 9-10.

11

settlement in January 2013 with no disciplinary action taken.

In 2012, plaintiff was on extended medical leave for approximately six months.  After return to "full and strenuous" duty following her medical leave and a position opened in Platoon 2 in January 2013, she was moved into that platoon.

In May 2013, a civilian complained to the State Police's Internal Affairs Bureau that plaintiff had parked her State Police vehicle in a handicapped parking space while doing personal shopping.  The civilian complainant took photographs and submitted them as part of the complaint.  The matter was investigated by Troop Commander Mark Koss.  As part of the investigation, Sgt. Lynda Smalley took photographs of the location days or weeks after the date in question.   Zone Sergeant O'Brien recommended that photographs taken after the relevant date and time should not be attached to the report.   Following investigation, the complaint was closed with a determination of "founded," plaintiff was found to have "acted in a manner tending to bring discredit upon the Division," and she was issued a letter of censure.

In August 2013, plaintiff filed a Charge of Discrimination with the New York State Division of Human rights, alleging that she had been retaliated against for complaining, and discriminated against because of her gender. The charge was remitted to the Equal Employment Opportunity Commission ("EEOC").

On October 16, 2013, plaintiff received a professional evaluation that stated that she had performed below State Police standards in issuing traffic tickets and enforcing the Vehicle and Traffic Law.  On the same date, Captain Gallivan wrote an assessment of plaintiff's work performance, including a chronological outline of problems that had been documented by station supervisors from January 1, 2013 – September 17, 2013.  Captain

12

Gallivan wrote:

> [Plaintiff] has been counseled by station supervisors countless times, and continues to conduct incomplete investigations, fails to end shift and import incidents at the end of every shift as required, fails to submit DIR's in accordance with Zone orders, often fails to submit paperwork in a timely manner, consistently makes poor/incomplete SJS entries that require corrective action, fails to adequately enforce the Vehicle and Traffic Law in accordance with Division's Mission Priorities, and generally fails to meet even the most basic administrative expectations of a thirteen year veteran trooper. It is understood that troopers occasionally make errors/ omissions, or submit paperwork late. However, this is the norm for Tpr. Colton, and there seems to be no training or counseling that will remedy this.

Def. Stat. Fact, ¶ 60 (citing Def. Ex. C, p. 879).[20]

On October 27, 2013, plaintiff was issued a performance observation form stating her performance was below standards: plaintiff had issued 15 tickets in 14 days of work – the lowest at the station.

On November 27, 2013, plaintiff received a performance observation form, again stating that her performance was below standards, having issued 11 tickets in 14.5 days – again the lowest at the station.

In November and December 2013, plaintiff was assigned to, and completed, remedial observation and training with a field training officer in order to "help her improve or enhance her on the job performance."

On December 31, 2013, a hearing officer presiding over plaintiff's grievance relative to the October 16, 2013 professional evaluation determined that plaintiff was correctly supervised, and that her enforcement efforts were far below that of her peers.

---

[20]Plaintiff responds to this statement by asserting: "Plaintiff does not Dispute that the Statement referenced above is found in Exhibit C, p. 879. However, Plaintiff disagrees with Captain Gallivan's assessment and characterization of Plaintiff's work performance. Pl. Resp. Stat. Fact, ¶ 60.  Again, she fails to point to admissible evidence supporting the basis for her disagreement.  Therefore, defendant's properly supported statement is deemed established for purposes of this motion.

IV.    **DISCUSSION**

    **a.  Gender-Based Hostile Work Environment**

    Defendant argues that plaintiff's gender-based hostile work environment claim must

be dismissed because she fails to present evidence establishing (1) that she was subjected

to severe or pervasive harassing conduct, and (2) that the conduct forming the basis of her

claim was taken on account of her gender.  Plaintiff opposes dismissal, arguing that she

was subjected to repeated and unwarranted scrutiny and employment restrictions because

of her gender.

    **1.  Hostile Work Environment Standard**

    To establish a claim of hostile work environment, a plaintiff must prove that the

workplace was permeated with discriminatory intimidation, ridicule, and insult that was

sufficiently severe or pervasive to alter the conditions of the victim's employment and create

an abusive working environment.  Clark County School District v. Breeden, 532 U.S. 268,

270 (2001); Harris v. Forklift Sys., 510 U.S. 17, 21 (1993); Quinn v. Green Tree Credit

Corp., 159 F .3d 759 (2d Cir.1998).  A "hostile work environment claim will succeed only

where the conduct at issue is so 'severe and pervasive' as to create an 'objectively hostile or

abusive work environment,' and where the victim 'subjectively perceive[s] the environment

to be abusive.'" Richardson v. N.Y. State Dep't. of Correctional Serv., 180 F.3d 426, 436 (2d

Cir. 1999), *abrogated on other grounds by* Burlington N. & Santa Fe Ry. Co. v. White, 548

U.S. 53, 126 S. Ct. 2405, 165 L. Ed.2d 345 (2006)(quoting Harris, 510 U.S. at 21-22).  The

objective aspect of this test is judged by a reasonable person standard.  Id.  To analyze a

hostile work environment claim, the Court "must look to the record as a whole and assess

the totality of the circumstances, considering a variety of factors including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 102 (2d Cir. 2010)(quoting Harris, 510 U.S. at 23).

The Second Circuit has repeatedly held that "[i]solated, minor acts or occasional episodes do not warrant relief" under a hostile environment theory. Brennan v. Metropolitan Opera Assn, Inc., 192 F.3d 310, 318 (2d Cir. 1999)(citing Kotcher v. Rosa and Sullivan Appliance Ctr., Inc., 957 F.2d 59, 62 (2d Cir. 1992)). "Generally, unless an incident of harassment is sufficiently severe, 'incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" Gorzynski, 596 F.3d at 102 (quoting Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)); see also Kaytor v. Elec. Boat Corp., 609 F.3d 537, 547 (2d Cir. 2010);[21] Alfano, 294 F.3d at 376;[22] Williams v. Cnty. of Westchester, 171 F.3d 98, 100 (2d Cir. 1999);[23] Batchelor v. City of New York, 12 F. Supp. 3d 458, 480 (E.D.N.Y. 2014).[24] A plaintiff must plead and prove that the alleged incidents were "continuous and concerted," or that standing alone, a single episode was "severe enough" to establish a hostile working environment. Cruz v. Coach Stores,

---

[21]("Isolated incidents ... will not suffice to establish a hostile work environment unless they are extraordinarily severe." )

[22]("the twelve incidents cited by [plaintiff], taken together, [we]re insufficient as a matter of law to meet the threshold of severity or pervasiveness required for a hostile work environment")

[23](plaintiff must show "more than a few isolated incidents" and that "evidence solely of sporadic" discrimination does not suffice) (quotation marks and citation omitted)

[24]("The very essence of a hostile work environment claim is that the actions comprising the hostile work environment are systematic and 'sufficiently continuous and concerted in order to be deemed pervasive.'") (quoting Alfano, 294 F.3d at 374)

<u>Inc.</u>, 202 F.3d 560, 570 (2d Cir. 2000).   While "reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions." <u>Morrison v. Potter</u>, 363 F. Supp. 2d 586, 591 (S.D.N.Y. 2005).

It is well-established that Title VII "does not set forth a general civility code for the American workplace," <u>Burlington Northern & Santa Fe Ry. v. White</u>, 548 U.S. 53, 68 (2006), and does "not prohibit all verbal or physical harassment in the workplace," only that which is motivated by specified improper considerations.  <u>Oncale</u>, 523 U.S. at 80-81.  Thus, in order to be actionable, the discriminatory conduct must have been directed at employees "because of their race, gender, religion, or national original." <u>Harris</u>, 510 U.S. at 22; <u>see</u> <u>Patane v. Clark</u>, 508 F.3d 106, 112 (2d Cir. 2007);[25] <u>Brown v. Henderson</u>, 257 F.3d 246, 252 (2d Cir. 2001);[26] <u>Gregory v. Daly</u>, 243 F.3d 687, 695 (2d Cir. 2001).[27]  As the Second Circuit explained:

> Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.

<u>Alfano</u>,  294 F.3d at 377.

---

[25]("The *sine qua non* of a gender-based discriminatory action claim under Title VII is that 'the discrimination must be *because of* sex.'")(emphasis in original) (quoting <u>Leibovitz v. N.Y. City Transit Auth.</u>, 252 F.3d 179, 189 (2d Cir. 2001))

[26]("It is axiomatic that mistreatment at work […] is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic.")

[27](Incidents comprising a hostile work environment claim must occur under circumstances under which they can "reasonably be interpreted as having been taken" because of the alleged discriminatory trait.)

16

### 2. Plaintiff's Claim

Defendant argues that although "plaintiff's complaint and deposition testimony are replete with conclusory allegations that she was treated differently by Zone Sergeant O'Brien and other supervisors because she is a woman, when asked for specific examples of discriminatory conduct, she stated only two." Def. Mem. L., p. 14. These are: (1) plaintiff was not allowed to use an unmarked Tahoe police vehicle for traffic patrol when she returned to SP Auburn in 2012; and (2) the past practice that allowed the senior member of a platoon to pick posts and create schedules was eliminated when plaintiff became the senior member of her platoon. Id. (citing plaintiff's deposition transcript). Defendant argues that "[t]here is no indication that either of the only two examples given by plaintiff are related in any way to her, or anyone else's, gender," id., and even if the "acts were undertaken because plaintiff is a woman . . . it remains that such acts are not severe or pervasive, and certainly not sufficiently severe or pervasive to constitute the basis of a Title VII action." Id. p. 16.

Plaintiff fails to specifically address defendant's contentions or provide specific citations to where in the record the basis for a genuine material dispute exists. Rather, she argues in conclusory fashion that her "testimony and declaration contradicts [*sic*] Defendant's position," and that her declaration "together with Defendant's own documentary evidence sufficiently refutes Defendant's contention as genuine issues of material fact exists [*sic*] on whether or not the defendant . . . created a gender-based hostile work environment . . . ." Pl. Mem. L. p. 4. Similarly, plaintiff argues in Point III of her

17

memorandum of law[28] that her "declaration and supporting documentary evidence" provide proof that "the numerous retaliatory actions and misconduct committed by Captain Gallivan against Plaintiff . . . were severe and pervasive enough to create an objectively hostile or abusive work environment." Id., p. 7.  Again, plaintiff provides no specific argument or citations to facts supporting a reasonable conclusion that the conduct in issue was motivated by considerations of her gender.

As indicated above, the Court is not required to search the record to find evidence that a party fails to point out.  Plaintiff's conclusory reference to her "supporting documentary evidence" is insufficient to oppose a properly supported motion for summary judgment.   Further, plaintiff's declaration provides little help in establishing her gender-based hostile work environment claim.  The majority of her allegations of adverse employment actions are attributed to a retaliatory motive, see Colton Decl., ¶¶ 11, 12, 13, 15, 17, 21, 23, 24, or to no unlawful motivation at all. See id., ¶¶ 14, 16, 18, 22.   The only allegations in her declaration containing any reference to gender are in paragraphs 19 and 20.

In paragraph 19, plaintiff alleges that "[a]t the SP Auburn post working under Captain Gallivan's authority, I was treated differently from all other female and male troopers similarly situated."  Id. ¶ 19.   Because plaintiff alleges that she was treated differently from *all other female and male troopers similarly situated*, not that she was treated differently because she is a woman, the allegation cannot reasonably support a claim that she suffered disparate treatment because of her gender.  See Anderson v. N.Y.C. Dep't of

---

[28]Point III is captioned: "The Evidence Supports That Questions of Fact Exist as to Whether Any Gender Based Hostile Work Environment Exists."

Corr., 2013 WL 5229790, at *6 (S.D.N.Y. Sept. 17, 2013);[29] see also Brennan v.

Metropolitan Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999).[30]  Instead, the allegation

"largely reflects a clash of personalities rather than a discriminatory animus." See

Kodengada v. IBM, 88 F. Supp. 2d 236, 243 (S.D.N.Y. 2000).

The other gender-related allegation is in paragraph 20.  This concerns plaintiff's

supervisor's determination that she not be assigned the unmarked Tahoe police vehicle

while on patrol. Id.  ¶ 20.  In this regard, plaintiff alleges:

> There came a time in 2012-2013 when I was assigned traffic patrol and was
> allowed to use the unmarked Tahoe. Thereafter, I was told I was no longer
> allowed to use the Tahoe again because I did not write enough tickets. From
> that day forward, when I was assigned to traffic patrol, I would use my patrol
> car  instead of the unmarked Tahoe.  However, all of the male troopers were
> allowed to rotate and use the unmarked Tahoe routinely. This action of
> disallowing me to utilize the unmarked Tahoe disadvantaged me as I was
> unable to write the number of tickets necessary to be average as compared to
> the other male troopers. This was yet another example of being treated
> different from the other male troopers similarly situated.

Id.

Defendant contends that the purpose of the unmarked Tahoe was to facilitate the

issuance of traffic tickets, and because Plaintiff had a historically low traffic ticket rate, an

administrative decision was made to reserve the unmarked Tahoe for those troopers who

wrote more tickets.  This sufficiently supports defendant's burden to articulate a legitimate,

nondiscriminatory reason for the challenged action, thereby shifting the burden to plaintiff to

demonstrate that defendant's articulation is merely a pretext for discrimination and that

---

[29](dismissing plaintiff's hostile work environment claim because "[e]ven considering her protected characteristics as a woman, there is no indication that her gender was a motivating factor in the creation of the alleged hostile work environment")

[30](A work "environment which is equally harsh for both men and women" cannot support a claim for sex discrimination.)

gender was the motivation behind the creation of an actionable hostile work environment.

Plaintiff has failed to meet this burden.  The record is undisputed that Plaintiff had a below-average traffic ticket rate, which she admitted was "low," and she had previously been allowed to use the unmarked vehicle.  Further, she provides no evidence, such as an anti-female statements by supervisors or coworkers, from which an inference of gender-based discrimination could be inferred.  Thus, plaintiff provides nothing beyond mere conclusions that the decision to limit her use of the unmarked Tahoe was motivated by considerations of her gender. See De La Pena v. Metropolitan Life Ins. Co., 552 Fed. App. 98, 100 (2d Cir. 2014).[31]

Even when assuming that the decision to limit plaintiff's use of the Tahoe was motivated by considerations of plaintiff's gender, and when combined with the decision preventing her from picking her post and creating schedules when she became the senior member of her platoon (which plaintiff attributes to retaliatory animus, not gender-based animus, see Colton Decl. ¶ 15), plaintiff fails to present facts from which a reasonable fact finder could conclude that she was subjected to sufficiently severe or pervasive gender-based hostility.  "These actions, considered in their totality, paint a picture of a challenging working environment  . . .  but, assessing the severity, frequency, and degree of [defendant's] alleged abuse, the Court does not find that they created a 'workplace ... so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [plaintiff's] employment were thereby altered.'" Batchelor, 12 F. Supp. 3d at

---

[31](affirming the Eastern District's finding that "…plaintiff's bald assertions of discrimination – unsupported by any meaningful comments, actions, or examples of similarly situated persons outside of plaintiff's protected class being treated differently – were implausible and insufficient to survive a motion to dismiss.")

479 (quoting Alfano, 294 F.3d at 373). "While Plaintiff [might have] found these conditions to be subjectively humiliating, there is no evidence that they were physically intimidating, and, based on the record before the Court, the conditions did not occur with such frequency that they could be said to create a 'pervasive' hostile work environment." Id. (citing Rivera, 743 F.3d at 20).

Moreover, plaintiff fails to present sufficient evidence indicating that the two allegedly gender-based decisions altered the conditions of her employment. See id.[32]  "Viewing all of these circumstances in total, [plaintiff] has not shown that [defendant's] subjecting her to excessive scrutiny and [employment restrictions were] so 'severe or pervasive' as to comprise an actionable hostile work environment claim." Id.[33]  Therefore,  plaintiff's gender-based hostile work environment claim is dismissed.

### c.  Retaliatory Hostile Work Environment Claim

Plaintiff also alleges that she was subjected to a hostile work environment in retaliation for requesting a hardship transfer to Platoon 2, see Pl. Mem. L. p. 6,[34] and filing

---

[32]("Nor is there evidence that this excessive scrutiny and criticism interfered with Plaintiff's job performance.")

[33](citing  Demoret v. Zegarelli, 451 F.3d 140, 150 (2d Cir. 2006) (affirming grant of summary judgment to defendants on hostile work environment claim where a supervisor's "close monitoring of [plaintiff's] work, his mild rudeness to her, ... his failure to take advantage of all of her abilities, ... reviewing her budget with a fine-toothed comb and his criticizing her for being five minutes late to department meetings even though male employees could skip meetings with impunity" was not "so severe as to be abusive"); Early v. Wyeth Pharm., Inc., 603 F. Supp.2d 556, 580 (S.D.N.Y. 2009) (finding "improper supervision," comprised of "allegations that [her supervisor] observed her from behind a machine, requested to see the contents of her pockets and threatened her job due to her admitted paperwork errors" did not comprise a hostile work environment))

[34]Plaintiff argues:

In the instant case, it is not disputed that Plaintiff submitted a memo requesting a hardship transfer to Platoon 2 from Platoon 1.  Thereafter, union delegate Nuessle, acting on Plaintiff's behalf, communicated Plaintiff's request to Major Koss. These discussions involving

(continued...)

an improper practice charge ("IPC") against Captain Gallivan related to that request.  See Colton Decl., Dkt. # 80-4, ¶ 11;[35] ¶ 13;[36] ¶ 23;[37] ¶ 24;[38] see also Am. Compl. ¶ 28;[39] ¶ 33;[40] ¶ 98.[41] Defendant argues that the claim must be dismissed because (1) plaintiff did not engage in an act protected under Title VII when she requested the transfer to Platoon 2, or when she filed the IPC concerning that request; (2) plaintiff cannot establish that she suffered an adverse employment action; and (3) the record does not support a finding of causation between the transfer request/IPC and any adverse employment action against plaintiff.

---

[34](...continued)
employment issues between Plaintiff and/or Plaintiff's union delegate and Major Koss are considered a "protected activity." . . . Captain Gallivan's undisputed denial of Plaintiff's hardship request for a transfer because, as Plaintiff alleges, he was "ticked off" because Plaintiff "went over his head' by going to Major Koss for permission to transfer, is all proof of adverse employment action taken against Plaintiff. Given these set of facts, it is undisputed that a causal connection exists between the protected activity and the adverse employment action.

Pl. Mem. L., p. 6.

[35]("As a result of me filing the IPC against Captain Gallivan, it is my firm belief that thereafter Captain Gallivan began to take action against me in retaliation for filing the IPC.")

[36]("There are several other personnel complaints filed against me by Captain Gallivan which were retaliatory in nature because of my filing of the IPC against him.")

[37]("I have no doubt that Captain Gallivan repeatedly retaliated against me for filing the IPC in 2011.")

[38]("Mr. Nuessle has testified that he believed that Captain Gallivan was harassing and retaliating against me creating [sic] a hostile work environment against me in response to me filing the IPC against him.")

[39]("That on or about June 2011, Defendant Gallivan retaliated against Plaintiff because Plaintiff filed an improper practice charge against Gallivan for denying Plaintiff a hardship request. The retaliatory conduct constituted of [sic] initiating a complaint against Plaintiff for allegedly not thoroughly investigating a damaged mailbox.")

[40]("Upon information and belief, the 2012 unsatisfactory work performance evaluation was issued by Gallivan as retaliation for Plaintiff filing the improper practice charge against Gallivan.")

[41]("Defendant's actions described above created a hostile work environment consisting of a retaliatory motivation arising from her improper practice charge against Gallivan.").

### 1. Title VII Retaliatory Hostile Work Environment Claim

Under Title VII, it is unlawful "for an employer to discriminate against any of [its] employees . . . because [that employee] has opposed any […] unlawful employment practice . . . or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). Title VII retaliation claims are analyzed under the well-established three-part burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Terry v. Ashcroft, 336 F.3d 128, 141 (2d Cir. 2003).

### A. *Prima Facie* Case

"In order to establish a *prima facie* case of retaliation, a plaintiff must present evidence that would permit a rational trier of fact to find that: (1) she engaged in protected participation or opposition under Title VII; (2) the employer was aware of this activity; (3) the employer took adverse action against the plaintiff; and (4) a causal connection between the protected activity and the adverse action, *i.e.*, that a retaliatory motive played a part in the adverse employment action." Dotson v. City of Syracuse, 2009 WL 2176127, at *16 (N.D.N.Y. July 21, 2009), aff'd, 549 Fed. Appx. 6 (2d Cir. 2013)(unpublished)(citing Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 205-206 (2d Cir. 2006)). "A plaintiff's burden in this regard is '*de minimis*,' and the 'court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive.'" White v. City of Middletown, 45 F. Supp. 3d 195, 214 (D. Conn. 2014)(quoting Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005)).

23

### I.  Plaintiff Engaged in Protected Activity

On the first element of the *prima facie* case, plaintiff must establish that she engaged in Title VII protected activity.  Protected activities include those actions "taken to protest or oppose statutorily prohibited discrimination." Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000).  In order to be considered protected by Title VII, plaintiff's actions must have been accompanied by a "good faith, reasonable belief that the underlying challenged actions of the employer violated [Title VII]." McMenemy v. City of Rochester, 241 F.3d at 283.  While plaintiff need not show that the challenged action was, in fact, unlawful under Title VII, McMenemy, 241 F.3d at 283, a subjective belief of impropriety is necessary. Sullivan Weaver v. N.Y. Power Auth., 114 F. Supp.2d 240, 243 (S.D.N.Y. 2000).

### ii.  Employer Aware of Protected Activity

"As to the second element [of the *prima facie* case], implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." Kelly v. Howard I. Shapiro & Assocs., 716 F.3d 10, 15 (2d Cir. 2013)(internal quotation omitted).  "The employer [must] have been aware of the protected activity [and] it [must have] understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII.  Mere complaints of unfair treatment […] are not protected speech under Title VII." Id.; see McNutt v. Nasca, 2013 U.S. Dist. LEXIS 7059, *48-*49 (N.D.N.Y Jan. 17, 2013);[42]

---

[42](A plaintiff must have clearly informed the employer that her complaint of unfair treatment was due to her membership in a class protected by Title VII.)

Batchelor, 12 F. Supp. 3d at 483. [43]

### iii.  Adverse Employment Action

On the third prong of the *prima facie* case, plaintiff must establish that the employer took adverse employment action against her.  However, Title VII's substantive provisions and its anti-retaliation provision on what constitutes an adverse employment action are not "coterminous."  Burlington Northern & Santa Fe Railway v. White, 548 U.S. 53, 67, 126 S. Ct. 2405, 165 L. Ed.2d 345 (2006).  "Rather, the [Supreme] Court held that a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means that it might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Dotson,  2009 WL 2176127, at *17 (quoting White, 548 U.S. at 68 (interior quotation marks and citation omitted)).

"This standard 'speak[s] of *material* adversity because ... it is important to separate significant from trivial harms.  Title VII ... does not set forth a general civility code for the American workplace.'"  White v. City of Middletown, 45 F. Supp. 3d at 217 (quoting White, 548 U.S. at 68)(emphasis in original)(internal quotation marks and citation omitted).  "Nevertheless, a harm that may be trivial for one, may be significant for another.  Put differently, '[c]ontext matters.'"  Id.  (quoting White, 548 U.S. at 69).  Consequently, "in determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently substantial in gross as to be actionable."  Hicks v. Baines,

---

[43]("While it is true that a complaint about discrimination can be an 'informal' one, it still must reasonably place an employer on notice that a plaintiff is complaining about discrimination based on gender, and result from conduct that a plaintiff herself had a 'good faith, reasonable belief' was prohibited by antidiscrimination laws.")(citations omitted)

593 F.3d 159, 165 (2d Cir. 2010).

"While uncommon, courts have recognized claims of retaliation in which the underlying adverse employment action is the creation of a hostile work environment." Dixon v. City of New York, 2008 WL 4453201, at *18 (E.D.N.Y. Sept. 30, 2008) (collecting cases), on reconsideration,  2009 WL 1117478 (E.D.N.Y. Apr. 24, 2009); see Richardson, 180 F.3d at 446.[44]  "The showing required for a retaliatory hostile work environment is similar [to a gender-based hostile work environment claim], except that the disparate treatment must be motivated not by discrimination based on plaintiff's membership in a protected group, but by retaliation for plaintiff's having engaged in a protected activity." Davis v. City of New York, 2010 WL 3895578, at *3 (S.D.N.Y. Oct. 5, 2010)(citing Gordon v. New York City Bd. Of Educ., 232 F.3d 111, 116 (2d Cir. 2000)).

### iv.  Causal Connection

Plaintiff must also "establish that . . . her protected activity was a but-for cause of the alleged adverse action by the employer." Univ. of Tex. Southwestern Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2534 (2013).  "[C]ausation can be demonstrated 'indirectly by showing that the protected activity was followed closely by discriminatory treatment, through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant.'" Dotson,  2009 WL 2176127, at *18 (quoting De Cintio v. Westchester County Med. Ctr., 821 F.2d 111, 115 (2d Cir.1987).  While "[t]here is no 'bright line' to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal

---

[44]("We adopt the view that unchecked retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment action so as to satisfy the second prong of the retaliation prima facie case.")

relationship, . . . close temporal proximity will not salvage a retaliation claim where the adverse employment action is initiated before the protected activity occurs." Id. (citations omitted).  "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." Id. (citations omitted).

If a plaintiff "shows a causal connection between the protected activity and the adverse conduct, the same 'severe or pervasive' standard [as applies in a gender-based hostile work environment claim] applies" to a retaliatory hostile work environment claim. Davis, 2010 WL 3895578, at *3 (citing Hall v. N.Y.C. Dept. of Transp., 2010 WL 1260198, *16 (E.D.N.Y. Apr. 29, 2009)); see also Benbow v. State Univ. of New York-New Paltz, 2014 U.S. Dist. LEXIS 63521, *24 (N.D.N.Y. May 8, 2014);[45] Rasco v. BT Radianz, 2009 WL 690986, at *15 (S.D.N.Y. Mar.17, 2009).[46]

## B.  Employer's Burden

"Once a *prima facie* case of retaliation is established, 'then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action that the plaintiff alleges was retaliatory.'"  White v. City of Middletown, 45 F. Supp. 3d at 214 (quoting Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010)).

---

[45]("[R]etaliatory hostile work environment claims are generally analyzed pursuant to the same severe-or-pervasive standard applicable to discriminatory hostile work environment claims.")

[46]("To establish that a retaliatory hostile work environment constitutes a materially adverse change that might dissuade a reasonable worker from reporting activity prohibited by Title VII, a plaintiff must satisfy the same standard that governs hostile workplace claims by showing that the incidents of harassment following complaints were sufficiently continuous and concerted to have altered the conditions of his [or her] employment.")

### C. Plaintiff's Ultimate Burden

If the defendant does so, the burden shifts back to the plaintiff who bears the burden of offering "evidence sufficient to create a triable issue of material fact as to whether . . . the 'unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" Dotson v. City of Syracuse, 549 Fed. Appx. 6, 7–8 (2d Cir. 2013)(quoting Nassar, 133 S. Ct. at 2533).   Thus, to prevail on her retaliatory hostile work environment or discrete act retaliation claims, plaintiff must establish a *prima facie* case of retaliation and that her protected activity was a but-for cause of the alleged adverse action by the employer.  See Mohammed v. New York City Dept. of Educ., 932 F. Supp. 2d 420, 430 (E.D.N.Y. 2013).[47]  "The employee at all times bears the burden of persuasion to show a retaliatory motive." Cox v. Onondaga Cnty. Sheriff's Dep't, 760 F.3d 139, 145 (2d Cir. 2014).

### 2.  Plaintiff's Retaliatory Hostile Work Environment Claim

### A. Protected Activity

Defendant's motion turns in the first instance on whether plaintiff engaged in Title VII protected activity that was the "but-for" cause of the alleged retaliatory acts.  The purported protected activity underlying plaintiff's retaliatory hostile work environment claim is her request for transfer to Platoon 2, and the IPC filed against Captain Gallivan related to the

---

[47]("The undisputed evidence weighs heavily against Plaintiff's claim of a causal link between her protected activity and any adverse employment action.  Because Plaintiff has failed to make a *prima facie* case of retaliation, the Court grants Defendants' motion for summary judgment with respect to all of Plaintiff's retaliation and retaliatory hostile work environment claims.")

denial of that request.[48]  In explaining the circumstances surrounding the transfer request

and the subsequently filed IPC, Plaintiff alleges:

> 3. On or about November 25, 2010, I was transferred to SP Auburn but placed on Platoon 1, despite my request for Platoon 2.
>
> 4. Over the next few weeks both the Police Benevolent Association ("PBA") delegate, Gary Nuessle ("delegate Nuessle"), and I spoke with Captain Gallivan on several occasions asking that I be changed over to Platoon 2 again because of child care and visitation issues. However, these discussions occurred without any success.
>
> 5. On January 24, 2011 at the direction of delegate Nuessle, I prepared a memorandum to the troop commander, Major Mark Koss, restating my request and the circumstances that led to the request for a hardship transfer to Platoon 2. Thereafter, delegate Nuessle requested a meeting with Major Koss to discuss my request and this situation.  At that meeting, delegate Nuessle presented my memo to Major Koss.

Colton Decl., ¶¶ 3-5.

Plaintiff alleges that Captain Gallivan told her that she had "ticked him off and the

Major as well" because she went "over his head" when her PBA delegate submitted her

transfer request directly to Major Koss rather than going through the chain of command. Id.

¶ 6.  Captain Gallivan, who Major Koss purportedly deferred decision making authority to on

the transfer request, continued to deny plaintiff's request for a transfer.  Id. ¶¶ 7-8.[49]

---

[48]While plaintiff's August 2010 complaint to the State Police Office of Human Resources (alleging that she had been discriminated against and/or harassed by Zone Sergeant O'Brien because of her gender) and her August 2013 Charge of Discrimination with the New York State Division of Human Rights (alleging that she had been retaliated against for complaining, and discriminated against because of her gender) are undoubtedly Title VII protected activity, plaintiff does not contend that either is the basis for the retaliation claims asserted here. Because Plaintiff is represented by counsel, the Court will not address theories that are not presented.

Plaintiff also alleges that she was retaliated against "because [she] did not bring in enough traffic tickets and arrest during [her] patrol." Colton Decl. ¶ 21.  The performance of Plaintiff's official duties does not constitute protected activity within the meaning of Title VII, therefore any retaliation stemming from the performance of her official duties is an insufficient basis for a Title VII retaliation claim.

[49]Defendant contends that Captain Gallivan is not the State Police personnel member who determines platoon assignments. See Gallivan Declaration, ¶ 29.

29

Plaintiff further asserts:

9.  Thereafter, I was advised by [PBA] delegate Nuessle and [PBA] Attorney Morris that it is well established that a union representative does not have to follow the chain of command when discussing labor related issues with the employer. Moreover, I was advised that discussing employment related issues with a union representative is a protected activity. Therefore, I was advised that when my delegate requested and conducted a meeting with Major Koss to discuss my employment related issues, that was a protected activity.  Additionally, I was told that by requiring me to follow the chain of command instead of allowing my PBA delegate to speak directly with the troop commander on a labor related matter, the employer was interfering with the PBA's ability to conduct its business in violation of Section 209-a.1(a) and (c) of the [New York Civil Service Law ("the  Act")].  Consequently, by reprimanding me for "going over his head" with the PBA, Captain Gallivan interfered with the PBA's ability to conduct its business in violation of Section 209-a.1(a) and (c) of the Act.

10. Accordingly, when Captain Gallivan denied my request for a hardship transfer because I went over his head and ticked him off by taking my request to Major Koss, the employer effectively committed an adverse employment action against me for exercising my right to engage in protected activity all in violation of Section 209-a.1(a) and (c) of the Act and Title VII.  Thereafter, on or about April 21, 2011, I filed the Improper Practice Charge ("IPC") as a result of this incident.

Colton Decl. ¶¶ 9-10.

As is evident, the facts surrounding the denial of the transfer request lacked any indication or allegation that considerations of plaintiff's gender, or of any other classification protected by Title VII, factored into the decision.   While plaintiff alleges that she requested the hardship transfer "because of child care and visitation issues," she makes no allegation that similarly situated male Troopers with child care and vitiation issues were permitted to transfer platoons,[50] or that considerations of her gender, a gender stereotype, or any other classification protected by Title VII were behind the denial of her request.  Plaintiff also fails to point to admissible evidence indicating that "her request to transfer was motivated by her

---

[50]Defendant contends that a hardship transfer does not apply to schedule, or platoon, changes, but rather is used to request a transfer between stations. See Gallivan Declaration, ¶ 27.

belief that her working conditions were infused with gender discrimination. There is also no contextual evidence of [plaintiff's] comments to [her PBA delegate, Captain Gallivan, or Major Koss] expressing a belief that the work environment was discriminatory, or otherwise indicating that her conduct was protected activity rather than a [simple transfer request]." Batchelor, 12 F. Supp. 3d at 483.  But "a transfer request is not a 'protected activity' within the meaning of 42 U.S.C. § 2000e3."  Bey v. I.B.E.W. Local Union # 3 Union Representatives, 374 Fed. Appx. 187, 188 (2d Cir. 2010).

Moreover, the IPC was based on the allegation that the transfer request was denied because Captain Gallivan was angry that plaintiff's PBA delegate "went over [Gallivan's] head,"  thereby constituting "an adverse employment action against Trooper Colton for exercising her right to engage in protected activity in violation of Section 209-a.1(a) and (c) of the [New York Civil Service Law]." Def. Exhibit B, p. 689; see Colton Decl. ¶ 10.   While the IPC uses the phrase "protected activity," the reference is to activity protected by New York Civil Service Law Sections 209-a(1)(a) and (c) .  These sections of the Civil Service Law do not address or remedy conduct protected by Title VII, but rather concern public employees' rights to form, join and participate in employee organizations. See  N.Y. Civ. Serv. Law § 209-a(1)(a) and (c) .[51]  Moreover, the IPC lacked any allegation that Captain Gallivan's actions were taken on account of plaintiff's gender or any other classification protected by Title VII.  See Def. Exhibit B, pp. 685-689; see also Colton Decl. ¶¶ 2-10.

---

[51]New York Civil Service Law Sections 209-a(1)(a) and (c) provide that "[i]t shall be an improper practice for a public employer or its agents deliberately (a) to interfere with, restrain or coerce public employees in the exercise of their rights [to form, join and participate in . . . any employee organization of their own choosing] for the purpose of depriving them of such rights; . . .  and,  (c) to discriminate against any employee for the purpose of encouraging or discouraging membership in, or participation in the activities of, any employee organization."  N.Y. Civ. Serv. Law § 209-a(1)(a) and (c) .

Even construing the facts underlying the transfer request and the IPC in the light most favorable to plaintiff, the "employment related issue" implicated by the transfer request and the IPC concerned only plaintiff's unsuccessful requests to be transferred to Platoon 2. Quite apart from addressing an issue protected by Title VII, the transfer request and the IPC concerned only matters of scheduling, the requirements of following the chain of command, and plaintiff's union's ability to represent its members. Thus, based upon the facts presented here, no reasonable fact finder could conclude that plaintiff held a good faith belief that the transfer request or the IPC was intended to oppose or protest discrimination statutorily prohibited by Title VII.

The record also lacks sufficient evidence from which a reasonable fact finder could conclude that the employer was, or should have been, aware that the transfer request or the IPC were directed at conduct protected or prohibited by Title VII. "General complaints that do not put the employer on notice of a claim of unlawful discrimination, do not constitute protected activity." White v. City of Middletown, 45 F. Supp. 3d at 215; see Ochei v. Coler/Goldwater Mem'l Hosp., 450 F. Supp.2d 275, 287 (S.D.N.Y. 2006).[52] Simply stated, plaintiff fails to meet the minimal requirements for establishing a *prima face* case of retaliation because she fails to establish that she engaged in protected activity under Title VII.

### B.  Adverse Employment Actions Caused by Protected Activity

Assuming, *arguendo*, that plaintiff engaged in Title VII protected activity when she requested a transfer and filed the IPC, the Court examines her retaliatory hostile work

---

[52](plaintiff "complaining about observations of her work, and other allegedly adverse actions" was not a protected activity because plaintiff did "not allege that she complained ... that she was the victim of discrimination")

environment claim to determine whether she has meets her burden of establishing: (1) that the challenged actions, either individually or in the aggregate, are cognizable as adverse employment actions under White; (2) the conduct she complains of was sufficiently "severe or pervasive" to qualify for relief; and (3) her protected activity was a but-for cause of the alleged retaliatory hostile work environment.

### I. Work Performance Scrutiny

Plaintiff alleges that in retaliation for filing the IPC, Capt. Gallivan initiated investigations into her work performance and "participated in negative job performance evaluations against [her]" including one involving "how [she] handled [a] domestic incident report (DIR)."  Colton Decl. ¶ 11.  Plaintiff also claims that, in general, her work was unfairly scrutinized. Id. ¶¶ 21-24.

"Although the [Supreme] Court 'loosened the standard previously applied in retaliation claims,' the White standard is still a rigorous one." Dotson,  2009 WL 2176127, at *17  (quoting Dixon, 2008 WL 4453201, at *11 (E.D.N.Y. 2008)).  "The law in this circuit, post-White, is clear that an employer's excessive scrutiny of an employee, without more, fails to satisfy the requirements for an adverse employment action." Id. at *18 (citing Dixon, 2008 WL 4453201, at *16).  "Moreover, reprimands that do not lead to materially adverse employment consequences are generally not considered actionable forms of retaliation." Id. (citing Brierly v. Deer Park Union Free Sch. Dist., 359 F. Supp.2d 275, 300 (E.D.N.Y. 2005)); see Anand v. N.Y. State Dep't of Taxation & Fin., 2013 WL 3874425, at *9 (E.D.N.Y. July 25, 2013).[53]

---

[53]("[C]ourts have found that reprimands, threats of disciplinary action[,] and excessive scrutiny do not constitute adverse actions in a Title VII retaliation context." (internal quotation marks omitted))

The uncontradicted record demonstrates that the employer's scrutiny and evaluations of plaintiff was justified by her history of poor and, in some instances, professionally improper, performance.  Further, while plaintiff  alleges that she believed that Capt. Gallivan "was going through [her] reports trying to find a reason to reprimand and discipline [her]," she concedes that "he never filed any formal complaints against [her]." Colton Decl., ¶ 11.  Without resulting tangible harm or consequences arising from the allegedly excessive scrutiny or reprimands, this conduct alone did not constitute an adverse employment action under White.  Dotson,  2009 WL 2176127, at *18; see e.g. Weeks v. N.Y. State Div. of Parole, 273 F.3d 76, 86 (2d Cir. 2001),[54] abrogated on other grounds, Nat'l R.R. Passengers Corp. v. Morgan, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).

Assuming the scrutiny constituted an adverse employment action, defendant responds by pointing to the uncontradicted record indicated that plaintiff consistently underperformed compared to her peers, and required regular correction and oversight.  See Def. Ex. A, pp. 116, 148, 236-38, 246-49, 257-58, 261, 263-77, 271-73, 275-89, 291-376, 378-432, 440, 444, 465.  This included plaintiff's inability "to regularly complete adequate [reports] without errors and her accident reports require frequent corrections as do her DIRs.  These errors and omissions are not the occasional oversight, but rather they are the norm for her nearly every day." Def. Stat. Fact, ¶ 33 (citing Def. Ex.  C, p. 871).

This constitutes an articulated of a legitimate, non-retaliatory reason for the regular scrutiny of plaintiff's work and for the negative performance evaluations she received,

---

[54]("It hardly needs saying that criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action.")

thereby shifting the burden back to plaintiff to demonstrate that the supervisory actions would not have occurred in the absence of her protected activity.

In response, plaintiff offers nothing more than conclusory allegations that the supervisory actions were undertaken to retaliate against her. These conclusory allegations are insufficient to satisfy plaintiff's burden of establishing that her alleged protected activity was a but-for cause of the employer's scrutiny and evaluations of her work performance. See Dotson, 2009 WL 2176127, at *18.

### ii. Damaged Mailbox

Plaintiff also alleges that in retaliation for filing the IPC, Capt. Gallivan "initiated yet another investigation against [her] with respect to a damaged mailbox complaint. . . . This investigation by Capt. Gallivan was unnecessary and without any merit but only to offend, intimidate and harass [her] and, overall, create a hostile work environment." Colton Decl. ¶ 12. However, despite plaintiff's conclusory contention, the record indicates that the investigation was commenced by plaintiff's immediate supervisor, Sgt. Mazur; that Sgt. Mazur discovered improprieties in plaintiff's investigation of the mailbox incident; that Sgt. Mazur reported her findings to Capt. Gallivan; that Capt. Gallivan reviewed Sgt. Mazur's findings and consulted with troop commander Maj. Koss; that Maj. Koss advised Capt. Gallivan to complete a personnel complaint worksheet against plaintiff; that Lieut. Kevin M. Reilly conducted an investigation into plaintiff's handling of the mailbox incident; that Lieut. Reilly found that plaintiff had engaged in professional misconduct; and that plaintiff was found guilty of professional misconduct and discipline as a result. See Def. Mem. L. pp. 9-

35

10.[55]  This explanation satisfies defendant's burden of articulating a legitimate,

nondiscriminatory reason for investigating plaintiff in relation to her handling of the mailbox

incident.

Although plaintiff alleges in conclusory fashion that there was no basis for the

investigation, there is no dispute that she was found guilty of professional misconduct based

on her handling of the mailbox incident.  Further, plaintiff offers no evidence to contradict

---

[55]Defendant asserts:

In April 2011, in the course of her duties, plaintiff was assigned to investigate a complaint that a civilian's mailbox had been damaged. See Exhibit B, pp. 730-44.  Plaintiff's immediate supervisor at the time, Sergeant Nancy Mazur, discovered that plaintiff had made missteps in the course of her investigation of the subject mailbox. See Gallivan declaration, ¶ 31. See also Exhibit I, pp. 104-06. In sum, plaintiff had completed and signed an accusatory instrument that she purported was based on her direct knowledge; she submitted the paperwork to the court. See Gallivan declaration, ¶ 32. See also Exhibit B, pp. 730-44. Plaintiff then completed and signed a second accusatory instrument that she stated was based upon information and belief. See Gallivan declaration, ¶ 33. See also Exhibit B, pp. 730-44.  Neither accusatory instrument had any supporting documentation attached, plaintiff had not interviewed witnesses, and she had no contact with the suspect. See Gallivan declaration, ¶ 33. See also Exhibit B, pp. 730-44.  Captain Gallivan reviewed plaintiff's investigations and actions vis-à-vis that complaint. See Exhibit B, pp. 730-44.  He then consulted with troop commander Major Koss, who advised that Captain Gallivan complete a personnel complaint worksheet. See Gallivan declaration, ¶¶ 35-36.

Captain Gallivan was not involved in the investigation, except in that he completed a memorandum as a witness. See Gallivan declaration, ¶ 38. See also Exhibit I, p. 107. The investigation was conducted by Lieutenant Kevin M. Reilly. See Exhibit B, p. 730.  Among the findings Lt. Reilly made are (non-exhaustively): plaintiff filed an accusatory instrument before she had probable cause to do so; she missed several steps that would link the suspect to the crime; she provided information to her supervisor that was inconsistent with the information she filed with the court; she filed documents with the court that were legally insufficient on their face; she failed to serve the suspect with an appearance ticket as was required to notify him that he had been charged; she used a fellow trooper's username and password without his knowledge or consent; and she filed an accusatory instrument that misrepresented her knowledge of what was being charged. See Exhibit B, pp. 742-43.  Plaintiff was found guilty of the professional misconduct in which she had engaged and was disciplined as a result. See Exhibit A, p. 3.

Captain Gallivan completed and submitted a personnel complaint worksheet upon complaint by his subordinate, Sergeant Nancy Mazur, and upon instruction from his supervisor, Major Koss; he neither discovered plaintiff's misconduct, nor did he conduct the investigation. See Gallivan declaration, ¶¶30-38. See also SMF, ¶¶ 27-30. See also Exhibit B, pp. 730-44.

defendant's contention that the investigation was commenced, and the ultimate finding of professional impropriety was made, by officers other than Capt. Gallivan. Under these circumstances, no reasonable fact finder could conclude that plaintiff's request to transfer platoons, or her IPC against Capt. Gallivan, was a but-for cause of the investigation and discipline regarding the mailbox incident.

### iii.  Parking in Handicapped-Reserved Spot

Plaintiff further alleges that "because of [her] filing of the IPC against [Capt. Gallivan], . . . he generated another personnel complaint against me when a complainant took a photograph of my patrol car parked in a handicap spot . . . .  Capt. Gallivan ordered Sgt. Smalley to return to the parking lot in question and take photographs of the parking lot. . . . When the photographs showed a gravel parking lot without any lines or any permanent handicap zone signs, Capt. Gallivan unilaterally decided to remove all the photographs taken by Sgt. Smalley from the evidence box and forward a written memo to the Major with a complaint against me stating that I improperly parked my vehicle in a handicap zone." Colton Decl., ¶ 13.  Defendant argues that the investigation was commenced based on a complaint by a private citizen, not by Capt. Gallivan; that Maj. Koss, not Capt. Gallivan, conducted the investigation into the allegation; that Maj. Koss, not Capt. Gallivan, determined based on the photographs submitted by the complaining citizen that plaintiff "acted in a manner tending to bring discredit upon the Division" and issued plaintiff a letter of censure; and "[e]ven assuming *arguendo* that Captain Gallivan removed the photographs as plaintiff alleges, such an act would be immaterial, both to the civilian complaint investigation, and to the instant motion and issues of liability, as the investigation was into plaintiff's act that day, not the parking lot in general, which could be altered, as the sign was

movable, and the civilian submitted photographs from the actual incident." Def. Reply Mem.

L., p 4 (citing Def. Stat. Fact, ¶¶ 52-57). Defendant further argues: "There is no evidence

that, again assuming *arguendo* that Captain Gallivan did remove the photographs, he did so

for any but legitimate reasons: Photographs taken days or weeks after the fact are not

relevant to what happened on the day a civilian saw plaintiff parked illegally." Id.

This explanation satisfies defendant's burden of articulating a legitimate,

nondiscriminatory reason for investigating plaintiff in relation to the citizen complaint about

her parking in a handicap spot while she was shopping, and for removing Sgt. Smalley's

photographs. In response, plaintiff offers no evidence to contradict defendant's contention

that the investigation was commenced because of the citizen complaint; that the

complainant submitted photographs of plaintiff's official vehicle parked in a handicap spot

while plaintiff was doing personal shopping; that the matter was investigated by Major Koss;

and that Major Koss made the adverse employment decision against plaintiff. Under these

circumstances, no reasonable fact finder could conclude that plaintiff's protected activity

was a but-for cause for the investigation, or the removal of Sgt. Smalley's photographs from

the investigation file.

### iv.  Change in Post Assignment Practice

Plaintiff alleges that "another example of Capt. Gallivan's retaliatory conduct involved

the situation where he changed the post assignment system to disadvantage me once I

became a senior member of the platoon." Colton Decl. ¶ 15.  However, defendant notes

that Plaintiff testified that she felt disadvantaged by the change in the post assignment

practice because she was no longer able to assign herself a post that allowed her to go

home for lunch. Def. Reply Mem. L. p. 2 (citing Colton Dep., Def Ex. F, pp. 59-60).

Defendant argues that "[t]his testimony supports Gallivan's statements that plaintiff consistently assigned herself to a post close to her home, to the disadvantage of other troopers." Id. pp. 2-3 (citing Gallivan Decl. ¶ 19; O'Brien Decl. ¶ 15). Defendant contends that "[t]he change in the post assignment system was not instituted to disadvantage plaintiff, but rather to prevent her from abusing the system to the detriment of her colleagues." Id. p. 3.

This explanation satisfies defendant's burden of articulating a legitimate, nondiscriminatory reason for the change in the post assignment practice. In response, plaintiff fails to provide sufficient evidence demonstrating that the change to the system was designed to retaliate against her for bringing an improper practice charge against Captain Gallivan. While undesirable work assignments can constitute adverse actions under White, the evidence before the Court indicates only that the change in the assignment practice prohibit plaintiff from engaging in conduct that the employer did not want to occur, that is, assigning herself a post that would allow her to go home for lunch to the detriment of her colleagues. Plaintiff points to no evidence indicating that the change in practice required her to work undesirable assignments or otherwise disadvantaged her. Under these circumstances, the challenged action, in itself, does not constitute adverse action under White. See  Wright v. City of Syracuse, 2014 WL 1293527, at *23 (N.D.N.Y. Mar. 31, 2014),[56] aff'd, 611 Fed. Appx. 8 (2d Cir. 2015).

Moreover, even assuming that the change to the post assignment system was specifically designed to target and disadvantage plaintiff in retaliation for bringing the

---

[56]("The receipt of undesirable work assignments must be accompanied by a materially adverse change in employment, such as demotion or loss of wages, in order to be actionable.")

39

improper practice charge, plaintiff offers nothing more than conclusory allegations that the change in assignment practice was for retaliatory reasons. Her conclusory contentions however, are insufficient to satisfy her burden of demonstrating that her protected activity was a but-for cause of the change in assignment practice.

### v. GPS Monitoring

Next, Plaintiff alleges that "another example of Capt. Gallivan's attempt to impact my job performance evaluations negatively was when he wrongly accused me of improperly performing my job because I left my assigned posts and went home," and "installed a GPS-AVL locator system in the patrol vehicles to determine where I was located and where I was going." Colton Decl. ¶ 16. Plaintiff alleges that "although using the GPS system was acceptable for securing safety reasons, it is not acceptable to stalk or follow a trooper 'just because.'" Id.[57]

Defendant responds that the installation of the GPS monitoring system was necessary both because supervisors were tasked with observing the troopers' locations to ensure their safety, and because the "Cayuga County 911 reported to plaintiff's supervisors that they could not reach plaintiff when they should have been able to and that she was unavailable when she should not have been." Def. Reply. Mem. L. p. 5 (citing Def. Ex. A, p. 260; Gallivan Decl., ¶ 40; O'Brien Decl., ¶¶ 21-28). This satisfies defendant's burden of articulating a legitimate, non-discriminatory reason for the challenged conduct, thereby shifting the burden back to plaintiff to demonstrate that the articulated reason was a pretext for discrimination and that a retaliatory animus was the but-for reason for the GPS

---

[57]Although plaintiff does not specifically allege that the installation of the GPS system was for retaliatory reasons, the Court will consider that such an allegation is implied.

monitoring.

In response, plaintiff has come forward with insufficient evidence tending to show that the installation of the GPS system was a pretext for retaliation. Indeed, plaintiff concedes that "using the GPS system was acceptable for securing safety reasons," and she does not allege that she was the only trooper subjected to GPS monitoring. Moreover, while plaintiff contends that she never left her post to go home, Colton Decl. ¶ 16, she does not dispute that Captain Gallivan received "frequent phone calls to the station from Cayuga County 911 asking what [plaintiff's] status was because she was seen on the dispatch screen as being off post for extended periods of time, or stationary for extended periods on post but not in-service." Def. Stat. Fact, ¶ 34 (citing Def. Ex. C, p. 871). These calls provide an independent basis for the GPS monitoring. Plaintiff's conclusory allegation that the GPS monitoring was motivated by retaliation is insufficient to carry her ultimate burden of demonstrating that the employer's stated reason for the conduct was a pretext for retaliation and that her protected conduct was a but-for cause of the GPS monitoring.

Further, plaintiff's allegation of monitoring of her whereabouts while on duty, without more, is "insufficient to present a triable claim that [plaintiff] she was subjected to a discriminatorily hostile environment." Temple v. City of New York, 2010 WL 3824116, at *6 (E.D.N.Y. Sept. 23, 2010); see Montgomery v. Chertoff, 2007 WL 1233551, at *12 (E.D.N.Y. Apr. 27, 2005);[58] Fleming v. Verizon N. Y., Inc., 2006 WL 2709766, at *11 (S.D.N.Y. Sept.

---

[58](citing cases and finding that "[e]xcessive scrutiny, without more, does not constitute an adverse employment action")

22, 2006);[59] see also Bader v. Spec. Metals Corp., 985 F. Supp. 2d 291, 329 (N.D.N.Y. 2013);[60] Liburd v. Bronx Lebanon Hosp. Ctr., 2009 WL 900739, at *8–9 (S.D.N.Y. Apr. 3, 2009);[61] Hill v. Rayboy-Brauestein, 2006 WL 3298383, at *10 (S.D.N.Y. Nov. 9, 2006).[62]

### vi. Call to Plaintiff's Mental Health Counselor

Plaintiff also alleges that Capt. Gallivan retaliated against her when he called plaintiff's mental health counselor and stated that plaintiff should be placed on leave and sent for a psychiatric evaluation.   Colton Decl. ¶ 17.   The mental health counselor declined to do either. Id.

While such conduct could dissuade a reasonable worker from making or supporting a charge of discrimination, plaintiff fails to allege when Capt. Gallivan placed this call. Without such information, plaintiff is unable to satisfy her ultimate burden of demonstrating that her protected activity was a but-for cause for the call.

### vii.  Insulting Statements

Further, plaintiff alleges that she was insulted when Capt. Gallivan "stated to others in supervisory positions or fellow troopers" that he viewed plaintiff as a "train wreck," a "mess," "not capable of doing [her] job," "not writing enough tickets," and "not performing [her] job properly."  Id. ¶ 18.  While plaintiff was rightfully offended by these statements, she

---

[59](stating that excessive monitoring and oversight of work do not constitute adverse employment action)

[60]("The yelling and monitoring are insufficiently severe or pervasive to give rise to hostile work environment claim, especially in light of Plaintiff's acknowledgment at her deposition that the monitoring may have been limited in time.")

[61](finding that supervisor's reference to the plaintiff's "black ass" on multiple occasions, as well as his monitoring of plaintiff's whereabouts, did not amount to a hostile work environment)

[62]("[e]xcessive scrutiny, without more, does not constitute an adverse employment action.")

fails to offer sufficient evidence from which a reasonable fact finder could conclude that Capt. Gallivan's statements were motivated by plaintiff's request for a platoon transfer or her filing of an IPC, as opposed to being motivated by her deficient performance over the term of her employment.  Further, none of the statements are of sufficient severity to create an actionable hostile work environment, and while plaintiff contends that Capt. Gallivan "repeatedly" made the statements to others, she fails to provide sufficient evidence indicating that the statements were pervasive enough to support a hostile work environment claim.  Gorzynski, 596  F.3d at 102; Kaytor, 609 F.3d at 547; Alfano, 294 F.3d at 376; Williams, 171 F.3d at 100;  Batchelor, 12 F. Supp. 3d at 480.

### C.  Conclusion - Retaliatory Hostile Work Environment Claim

Because plaintiff has failed to establish that she engaged in Title VII protected activity when she requested a platoon transfer or when she filed a IPC regarding Capt. Gallivan's denial of that request, her retaliatory hostile work environment claim is fatally flawed.  Moreover, even assuming that she engaged in Title VII protected activity, plaintiff has failed to establish (1) that the protected activity was a but-for cause of the adverse employment actions she contends she suffered; (2) that the employer's legitimate, nondiscriminatory reasons for the challenged actions was a pretext for discrimination and that retaliation was the true motive for these actions; and (3) that she was subjected to severe or pervasive hostility in the workplace, or unwarranted scrutiny, discipline, or reprimands.  Accordingly, plaintiff's retaliatory hostile work environment claim is dismissed.

### b.  Discrete Acts of Retaliation

Plaintiff brings discrete act retaliation claims, challenging much of the disciplinary, remedial, and administrative/staffing actions taken by her supervisors.  Again, however,

plaintiff points only to the platoon transfer request and the subsequent IPC as a basis for these claims.  For the reasons discussed with regard to plaintiff's retaliatory hostile work environment claim, plaintiff fails to present facts upon which a reasonable fact finder could conclude that she engaged in Title VII protected activity causing her to suffer an adverse employment action.  Moreover, plaintiff fails to present sufficient facts from which a reasonable fact finder could conclude that the adverse employment actions she contends she suffered were causally related to the alleged protected activity, or that the employer's legitimate nondiscriminatory reason for the actions was a pretext for discrimination and that the actions were motivated by retaliation.   Accordingly, plaintiff's discrete act retaliation claims are dismissed.

## V.    CONCLUSION

For the reasons discussed above, defendant's motion for summary judgment [Dkt. # 73] is GRANTED, and plaintiff's action is dismissed.  The Court Clerk may enter judgment in defendant's favor and close the file in this matter.

**IT IS SO ORDERED.**

Dated: February 8, 2017

Thomas J. McAvoy
Senior, U.S. District Judge